UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

BR ASSOCIATES, INC.,
an Indiana corporation,

        Plaintiff,

v.

        Case Number 06-11870-BC
        Honorable Thomas L. Ludington

A.J. LAFRAMBOISE, DELORES A.
LAFRAMBOISE, and LAFRAMBOISE
REALTY, LLC,

        Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, DENYING WITH PREJUDICE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THE SOUTH ACCESS DRIVE, DENYING WITHOUT PREJUDICE DEFENDANTS' MOTION AS TO ALL OTHER CLAIMS, PERMITTING SUPPLEMENTAL MATERIALS, AND RESCHEDULING FINAL PRETRIAL CONFERENCE AND TRIAL

The plaintiff, BR Associates Inc.(BR), began this case on April 20, 2006 alleging that the defendants, A.J. LaFramboise, Delores A. LaFramboise, and LaFramboise Realty (collectively LR), breached an express easement agreement, trespassed onto its property, and created a nuisance. BR also alleges that LR's acts were intentional and it is entitled to treble its economic damages and injunctive relief. On April 20, 2007, LR filed a motion for summary judgment as to all counts of BR's complaint. The same day, BR filed a motion for partial summary judgment. The parties have not responded in opposition to the respective motions.

The Court heard oral argument on June 14, 2007, and now concludes that BR is entitled to partial summary judgment with respect to its claim of breach of easement agreement as to the south access drive, its claims of nuisance and trespass will be subject to more specific proofs at trial as will

the parties' competing contentions that the north access drive was moved in such a manner as to suggest a material breach of the easement agreement. Accordingly, the Court will grant in part BR's motion for summary judgment and deny LR's motion for summary judgment with prejudice for BR's claims regarding the south access drive and without prejudice for BR's claims for loss of the north access drive, trespass, and nuisance.

I.

This case largely arises out of an alleged breach of an express easement agreement, and for



ease of reference, the diagram above depicts the easements and property at issue. BR owns and operates a Long John Silver's restaurant just west of the North Union Street and Euclid Avenue intersection in Bay City, Michigan. LR operates a plaza east of the Long John Silver's and at the North Union/ Euclid intersection.

Until 2004, a Burger King franchise, owned and operated by King Venture, was located on the north side of LR's plaza. The Burger King had frontage on Euclid. Subsequently, King Venture

closed the Burger King and sold the property to defendant Al LaFramboise. LaFramboise then transferred the property to LR. LR demolished the Burger King and added on to the plaza by building northward across the Burger King site. The addition created space for five additional tenants.

According to LR, BR's employees were well aware of the construction. In fact, BR's agents advised BR's corporate office about the construction. However, LR maintains, at no time did BR ask for a site plan of the construction. Nor did BR tender any objection to the construction to LR or local authorities.

Nonetheless, after construction was completed, BR claimed that the plaza blocked an easement arising out of the express easement agreement entered into by the parties or their predecessors in interest. The agreement at issue reads as follows:

> 1. King Venture and Johnson/LaFrambise hereby grant to BR *a perpetual, non-exclusive easement appurtenant to the BR parcel for use by BR and its respective* tenants, invitees, employees and agents for ingress and egress of vehicular traffic to and from the BR Parcel over the Easement Area, as hereafter defined, to Euclid Road (M-13)
>
> 2. BR hereby grants to King Venture and Johnson/LaFramboise *a perpetual, non-exclusive easement appurtenant to the King Venture Parcel and the Johnson/LaFramboise Parcel for the use by King Venture and Johnson/LaFramboise* and its respective tenants, invitees, employees and agents for ingress and egress of vehicular traffic to and from the King Venture Parcel and Johnson/LaFramboise Parcel over the Easement Area, as hereafter defined, to North Union Road.
>
> 3. The location of the easement hereby granted ("the Easment Area") shall be over and across (i) those areas designated as "Access Drives" on the Site Plan attached hereto as "Exhibit D" and incorporated herein by reference; and those parts of the King Venture Parcel, Johnson/LaFramboise Parcel and BR parcels that have been developed and constructed for use as driving isles and as ingress and egress points abutting Euclid and North Union Road, respectively, as such areas may exist from time to time.

> 4. King Venture and BR shall have the right to *relocate from time to time and in each party's own discretion, those driving aisles and ingress and egress points* located on their own Parcels described in 3(ii) above, provided that such relocation does not adversely effect the other party's right to use the Easement Area. The access drives described in 3(I) above may only be relocated upon the mutual written agreement of the parties hereto. Johnson/LaFramboise expressly grants to King Venture the right to act on behalf of the Johnson/LaFramboise Parcel with respect to this Paragraph.
>
> 5. King Venture shall be responsible for the initial construction of the Access Drives, which construction shall be at King Venture's sole cost and expense. After the initial construction, King Venture shall be responsible for the maintenance of the King Venture Parcel and the Johnson/LaFramboise Parcel, and BR shall be responsible for the maintenance of the BR Parcel.

Def.'s Mot. Summ. J. Ex. 1, Easement Agreement (emphasis added).

The easement agreement does not specify the width or the length of any of the "access drives" nor does it contain any legal description of the same. Instead, there is merely a pictorial depiction of the general easement area. Further, LR insists that the access drive on the south side between Burger King and the existing strip center never was constructed. King Venture or LR never made a curb cut onto Euclid Avenue. Nor did they take steps to remove the electrical poles that blocked that access drive.

LR further maintains that the north access drive remains at "almost" the same location as it did prior to the plaza addition. In fact, BR is unable to specify the distance the access drive is located from the north boundary line. LR points to paragraph four of the agreement, which gives it the authority to relocate "driving isles" on its property. LR contends that it simply moved the driving isles.

In addition, LR states that BR has no idea of how much of the easement had been used prior to initiation of the instant action. BR's president testified at his deposition that he had never conducted traffic studies to see how many people would use the easements:

| | |
|---|---|
| Q. | Did you prior to 1998 have any traffic studies done of who or who would be using this easement or who was using this easement? |
| A. | I did not. There was no value to it. |
| Q. | Okay. In any time from 1998 through 2005 did you ever have any traffic studies done to determine who, if anyone, was using the easement? |
| A. | I did not. I didn't have to because we had easements. No reason to. |
| Q. | So you're unable to say here today whether nobody used it or it was used by every customer that came to Long John Silver's? |
| A. | I'm not saying either way. |
| Q. | You don't have any idea one way or the other? |
| A. | No idea. |

Def.s' Mot. Summ. J. Ex. 8, Ruckriegel dep. at 9. LR states that BR similarly conducted no traffic studies of the easement before or after the addition to the plaza. Def.s' Mot. Summ. J. Ex. 5, Chase dep. at 9. LR concludes that because the easement has never been described, BR cannot demonstrate the width, the length, or the specific direction of the easement across the property.

BR asserts that LR has admitted the location of the easements. LaFramboise testified at his deposition that he agreed with the location of the access drives as depicted on the above diagram:

| | |
|---|---|
| Q. | Well you wouldn't disagree with me, would you, if . . . you had your glasses on and it said access drive, you would agree that says access drive; correct? |
| A. | Yup. Yup. |
| Q. | Okay, so you would admit that on the site plan drawing attached to the easement agreement, there are two access drives referred to – in the site plan, attached to the easement agreement? |
| . . . | |
| A. | Yup. |

LaFramboise dep. at 11-12.

BR also claims that it is undisputed that the south access drive has been blocked by the addition to the plaza and the north access drive has been moved. BR's president, Robert Ruckriegel, explained at his deposition that the north access drive also had been moved:

| | |
|---|---|
| Q. | Now, have you made any survey of the LaFramboise parcel regarding the use of the easement such that you've driven the easement and found it was blocked or drove the easement or found that it was restricted or you found the |

-5-

>   easement was limited in some fashion?
> 
> A. Have I outside parties do it?
> 
> Q. Have you done it yourself.
> 
> A. I have driven it.
> 
> Q. Okay. Were you able to drive around the building and get to the BR Associates' parcel?
> 
> A. Not in the easements that were designed.
> 
> Q. Could you do it?
> 
> A. The easement has been moved.
> 
> Q. Could you do it?
> 
> A. An easement has limited access the way it is and the way it was originally laid out.

Pl's Mot. Partial Summ. J. Ex. E, Ruckreigel dep. at 23 (grammar in original). Marcia Rabideau, a former BR employee, similarly testified:

> Q. When you would leave the Long John Silver's . . . or enter into the Long John Silver's . . ., would you normally go along the north side of the property?
>
> A. The north side being closer to the Burger King not far down where the easement is now.
>
> Q. Okay.
>
> A. Or that little bit of easement that's left.
>
> Q. All right. And then – what in your memory was the distance of the curb cut on the north side of the Burger King parcel from the property line, if you know?
>
> A. I don't know.
>
> Q. And then what is the distance of the curb cut from the north side of the property line now?
>
> A. I don't know.
>
> Q. Okay.
>
> A. I just know the easement is pushed further down.
>
> Q. Do you know how much further down it is pushed?
>
> A. No.

Pl.'s Mot. Partial Summ. J. Ex. F, Rabideau dep at 13.

LR alternatively contends that any recovery for breach of the easement agreement should be limited to $35,000. BR hired an appraiser, Terrell R. Oetzel, to value its property assuming an easement and excluding the easement. Oetzel estimated that the value of the property was $650,000

with the easement, and $615,000 without the easement. Def's Mot. Summ. J. Ex. 3, Appraisal Report.

LR also disputes that it constructed a parking lot onto BR's property where it placed an improvement, a cement pad for a dumpster, as BR alleges. LR notes that the entire rear boundary line between the two parcels is paved from front to back. Further, LR claims that no survey has been completed to determine whether there has been any encroachment. Thus, BR cannot, in LR's view, prevail in that regard.

LR challenges BR's allegations that it entered on to BR's property to excavate large holes on the west side of BR's property. However, Vernon Sullivan, chief operating officer of BR, was unable to say who excavated the holes. He testified at his deposition:

> Q. Is there anything in writing that you're aware of that would indicate LaFramboise was responsible for those holes?
> A. In writing, not to my knowledge that I have seen.
> Q. Other than the fact that these holes occurred at or near the time that the plaza was being constructed, is there anything else that you're relying upon to show a relationship between the two?
> A. The only thing I personally know is that there is a utility easement through that area where it was my belief that probably the utility was -- some utility work was done there for the plaza.
> Q. And again, what gives you that idea other than holes being cut right there?
> A. New development and the fact that that is an easement for the utility there.
> Q. And show me where in that easement agreement there's the utility easement, if it's in the document, 15 Exhibit 1?
> A. I don't know, sir.
> Q. Where did you come by information that a utility easement existed between the two parcels?
> A. It was on a drawing that I had seen on one occasion.
> Q. Okay. Do you have a copy of this drawing at your office?
> A. I do not personally have a copy of it, no.

Def.s' Mot. Summ. J. Ex. 6, Sullivan dep. at 38-39.

According to LR, another BR agent, Phillip Chase, similarly suggested that there was little evidence tying LR to the excavation. He testified:

> Q. So what evidence do you have other than the appearance of the plaza extension that LaFramboise had anything to do with those two holes next to the speaker or the menu board?
> A. I don't have anything to say on it, really I don't.
> Q. Well, it's alleged in your Complaint in the sense that BR Associates --
> A. But I don't have knowledge of that.
> Q. Okay. Then that's what I'm saying. That's what I'm trying --
> A. I don't personally have knowledge. Maybe somebody else in the Complaint does, but I don't.
> Q. Do you know anybody in the company that has knowledge of that?
> A. No.

Def.s' Mot. Summ. J. Ex. 5, Chase dep. at 31-32.

With respect to the easement agreement, as noted, BR believes that the LR violated that documents express provisions. First, LR demolished the Burger King and then added on to the existing plaza, a fact LR does not contest. As a result, BR contends that the additions to the plaza "completely destroyed" the south access drive easement. Pl.'s Mot. Partial Summ. J. at 6. LR's actions amount to, in BR's view, "a unilateral destruction of the [South] Access Drive . . . a clear violation of the Easement Agreement." *Ibid.* Further, the destruction of the access drive constitutes, BR maintains, an intentional trespass on its easement.

Second, BR states that LR unilaterally moved the north access drive easement. Movement of the access drive, BR claims, violates the express language of the easement agreement. In fact, the access drives, the easement agreement provides, "may only be relocated upon the mutual written agreement of the parties hereto." Easement Agreement at ¶ 4. BR concludes that it has been irreparably harmed:

> Plaintiff, has lost an unquantifiable amount of business due to the fact its customers do not have access to Plaintiff's Parcel from Euclid Avenue as granted in the

> Easement Agreement. Defendants' destruction of the First Access Drive Easement and relocation of the Second Access Drive Easement has made it extremely inconvenient for Plaintiff's customers to get to Plaintiff's parcel and its Long John Silvers restaurant.
>
> Further, the Easements were negotiated so that each party would have access to both North Union Road and Euclid Avenue. The Defendants' actions in this matter have destroyed the access to Euclid Avenue that was negotiated by the Plaintiff. This access was important not only for the current restaurant that exists on the Plaintiff's Parcel, but also for future developmental purposes. Defendants' construction across the access drives virtually destroys the future marketability and development potential of the BR Parcel and other parcels owned by BR. This damage cannot be quantified.

*Id.* at 7.

BR separately claims that LR has trespassed onto its parcel. First, LR has placed trash dumpsters on parcels A and B such that garbage trucks must enter onto its property outside the area described by the easement area. In addition, BR maintains that LR constructed the additions to the plaza in such a manner that requires delivery drivers and companies to park on BR's parcel for loading and unloading. Although this area falls under the easement agreement, the agreement only contemplated ingress and egress as a use. Moreover, at times, BR complains, delivery trucks actually parked on BR's parcel.

> Ruckriegel testified as follows at his deposition:
>
> Q. Whenever you've done that (drive around the property), have you been restricted in any fashion so that you could not complete the circuit?
> A. The first time yes.
> Q. And when did that occur, if you know?
> A. I don't know the dates.
> Q. Any idea of the season? Was it wintertime, summertime?
> A. No idea.
> Q. Okay. Who was with you when you made that attempt?
> A. I don't know.
> Q. What was the purpose for you driving around the building? To see if you could do it?
> A. Yes. It wasn't me physically driving. I was riding.

| | |
|---|---|
| Q. | Okay. And then what was it that limited or restricted your ability to drive around? |
| A. | The way the parking was arranged and the end of the LaFramboise building. |
| Q. | Could you get around the north end of the building at all? |
| A. | I don't recall. |
| Q. | Did you attempt to even get to the north end of the building? |
| A. | Yes. |
| Q. | Okay. And then the parking, was the parking on the east side of the building that interfered with it or the parking on the west side of the building? |
| A. | Which is west, which is east? |
| Q. | Euclid would be east. BR Associates' side would be west. |
| A. | Okay, in the rear corner of the day that I was there – and I cannot tell you what season, sunrise, sunset, whatever – |
| Q. | All right. |
| A. | – but we were there. The bumper blocks were moved and rearranged so traffic could not get around the rear corner of the building. |
| Q. | So traffic could come around the rear corner? |
| A. | After they way rearranged. |
| Q. | Okay. And then your recollection was it was a car or truck or combination of both that were parked and stopped it? |
| A. | Whatever, dumpster, cars, bicycles. |
| Q. | Again, no idea. |
| A. | No idea. |

Ruckriegel dep. at 24-26.

Rabideau also testified that there was some blockage:

| | |
|---|---|
| Q. | Do you have any experience of driving both ways in the sense that you've driven around the plaza extension as it exists compared with the way you used to go through the parking lot? |
| A. | Yes. |
| Q. | And has it added anything appreciable to your travels? |
| A. | I don't know. |
| Q. | Okay. Would you agree with me that it may have added a second or two of time for you? |
| A. | Well, it added when – when they put the dumpsters back there, you couldn't even get through until they removed they moved the dumpsters. But after the dumpsters were moved to around the building, that there – there is only on little car length to get through. |
| Q. | You mean car width – |
| A. | Yes. |
| . . . | |
| Q. | Now, we – we talked a little about the workers cars. Where were the |

| | workers' cars located? |
|---|---|
| A. | Well, when they first opened the business, the workers' cars would park east and west. So sometimes that would interfere with the drive-thru as well – it would be backed up along Long John Silver's. It would depend. I mean sometimes they would park by the back doors of the entrance to the building. |
| Q. | You mean the west side of the plaza? |
| A. | Yes. |
| | . . . |
| Q. | Would they park two deep, like one car behind the other? |
| A. | I don't recall if it was two deep. I don't recall. |
| Q. | Were they – meaning T-W-O deep. Not – not suggesting that they park 10 feet away from the building or 20 feet away from the building. Do you understand the difference between the two? |
| A. | Yes. |
| Q. | Okay, then what was blocking? If you need to draw a picture, then perhaps that would be more helpful for me. Can you do that? |
| A. | I don't recall. In fact, I don't want to draw a picture because I don't remember. I mean I don't exactly recall what vehicles were there and . . . |
| Q. | The drive-thru essentially starts, does it not, about where the old structure ended. Were – were cars parked in this area that I'm drawing a circle around which is essentially the – |
| A. | I mean, there would be cars parked everywhere at times. I mean it would be behind Little Ceaser's on the side of the dumpster, behind this dumpster parked in form of this big dumpster, vans. I mean, the Chinese restaurant, when they opened, they had a big old van that they parked and 14 people go out of the van and they worked like that for the day. So it just depended. I mean, I don't know. I don't know how many businesses are in there, but at times there were cars everywhere lined up. |
| Q. | Okay. Do you know if those cars were on BR Associates parcel versus being on the LaFramboise parcel? |
| A. | I don't know what – what – whose parcel is what. |

Rabideau dep. at 14, 39-40

BR contends that LR's conduct violates the easement agreement and places an increased burden on the easement. LR's actions constitute a trespass, in BR's view, and create additional wear and tear on BR's parking lots. Finally, LR's activities interfere with BR's business. The easement agreement simply did not contemplate loading and unloading of vendor vehicles as well as parking or that LR would use BR's property for uses beyond simple customer ingress and egress

-11-

contemplated by the easement agreement.

BR initiated this action on April 20, 2006. In its five-count complaint, BR alleges that LR breached the easement agreement by unilaterally blocking the south access drive and altering the location of the north access drive (count one); that LR trespassed on its property by digging holes, failing to patch and repair holes, and constructing a parking lot that runs onto BR's parcel (count two); that LR has improperly used the easement area by, among other things, allowing garbage trucks onto the easement to remove trash and allowing delivery vans to park on BR property (count three); that LR has created a nuisance by allowing garbage trucks to increase the wear and tear on the easement area and by using unsanitary dumpsters (count four); and that LR intentionally committed the conduct alleged in counts three and four entitling BR to treble damages (count five). The complaint also seeks declaratory, injunctive, and monetary relief.

II.

When a party moves for summary judgment under Federal Rule of Civil Procedure 56, the Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The moving party bears the burden in the first instance of identifying the basis for its motion and designating portions of the record that demonstrate the absence of a genuine issue of material fact for trial. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The opposing party may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact"; rather, she must make an affirmative showing with proper evidence in order to defeat the motion.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). An affirmative showing with proper evidence includes designating specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

A.

Michigan courts have defined an easement as the right to use the land of another for a specific purpose. *Bowen v. Buck & Fur Hunting Club*, 217 Mich. App. 191, 192, 550 N.W.2d 850 (1996). Under Michigan law, "[a]n easement may be created by express grant, by reservation or exception, or by covenant or agreement." *Michigan State Hwy. Comm. v. Canvasser Bros. Building Co.*, 61 Mich.App. 176, 181, 232 N.W.2d 351 (1975); *Rossow v. Brentwood Farms Development, Inc.*, 251 Mich.App. 652, 651 N.W.2d 458 (2002). In this case, the parties entered into an easement by agreement. Generally, an easement agreement is construed much like a contract. *Burleson v. Norwest Bank Indiana*, 2002 WL 31928563 at *6 (Mich. Ct. App. 2002); *Forge v. Smith*, 458 Mich. 198, 580 N.W.2d 876 (1998).

As the Michigan Supreme Court has explained, "[i]n order to create an express easement, there must be language in the writing manifesting a clear intent to create a servitude. Any ambiguities are resolved in favor of use of the land free of easements." *Forge*, 458 Mich. at 205, 580 N.W.2d at 880-81. Under Michigan law, a plaintiff claiming breach of an easement agreement must first establish the elements of a valid contract. *Pawlak v. Redox Corp.*, 182 Mich. App. 758, 453 N.W.2d 304, 307 (1990). A valid contract exists when "(1) parties [are] competent to contract, (2)

[there exists] a proper subject matter, (3) a legal consideration [is present], [and] (4) mutuality of agreement, and (5) mutuality of obligation [exist]." *Thomas v. Leja,* 187 Mich. App. 418, 468 N.W.2d 58, 60 (1990). If the plaintiff establishes the existence of a contract under Michigan law, the plaintiff must "then prove by a preponderance of the evidence the terms of the contract, that the defendant breached the terms of the contract, and that the breached caused the plaintiff's injury." *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003) (construing Michigan law) (citing *Platsis v. E.F. Hutton & Co., Inc.*, 642 F. Supp. 1277, 1309 (W.D. Mich. 1986)).

The plain unambiguous language of an agreement controls the determination of whether breach has occurred. *Metropolitan Life Ins. Co. v. Foote*, 95 Mich. App. 399, 404, 290 N.W.2d 158, 160 (1980) (reasoning that if the language of the contract is plain and unambiguous, then the court must implement the clear terms of the agreement). Whether the terms of an agreement are unambiguous is a question of law for the Court to decide. *UAW-GM Human Resource Center v. KSL Recreation Corp.*, 228 Mich. App 486, 491, 579 N.W.2d 411, 413 (1998). As a general rule, the terms of the reement are ambiguous if they are reasonably susceptible to more than one interpretation. However, "if a contract, although clumsily arranged, fairly admits of but one interpretation, it is not ambiguous." *Meagher v. Wayne State Univ.*, 222 Mich App. 700, 721, 565 N.W.2d 401, 411 (1997). The Court's ultimate role "in the construction or interpretation of any contract is to honor the intent of the parties." *Raheed v. DiamlerChrysler Corp.*, 445 Mich. 109, 127 n.28, 517 N.W.2d 19, 28 (1994).

There can be no dispute the LR breached the express terms of the easement agreement when it constructed the addition to the plaza. The easement agreement provides that an "access drive" can "may only be relocated upon the mutual written agreement of the parties hereto." Easement

Agreement at ¶ 4. LR does not contend that it sought the consent of BR when it began construction and built structures on the south access drive. Nor does LR claim that the easement agreement is ambiguous. Instead, LR claims that the south access drive never came into existence *at all*. No curb cut was made, and the electrical installations otherwise blocking the south access drive preventing its use were never removed. Despite the fact that easement agreement depicts the south access drive, BR did not require that King Venture or LR construct the access drive. The parties course of performance, LR explains, demonstrates that there never an intent to open the south access drive.

The Court is unpersuaded, notwithstanding the obvious question about the relevant statute of limitations. The mutual intent is clearly expressed in the plain language of the easement agreement. LR granted "BR a perpetual, non-exclusive easement appurtenant to the BR parcel for use by BR and its respective tenants, invitees, employees and agents for ingress and egress of vehicular traffic to and from the BR Parcel over the Easement Area, as hereafter defined, to Euclid Road (M-13)." Easement Agreement at ¶ 1. In return, LR benefitted from "a perpetual, non-exclusive easement appurtenant to the King Venture Parcel and the Johnson/LaFramboise Parcel for the use by King Venture and Johnson/LaFramboise and its respective tenants, invitees, employees and agents for ingress and egress of vehicular traffic to and from the King Venture Parcel and Johnson/LaFramboise Parcel over the Easement Area, as hereafter defined, to North Union Road." *Id.* at ¶ 2.

The easement area was defined to "be over and across (i) those areas designated as "Access Drives" on the Site Plan attached hereto as "Exhibit D" and incorporated herein by reference; and those parts of the King Venture Parcel, Johnson/LaFramboise Parcel and BR parcels that have been developed and constructed for use as driving isles and as ingress and egress points abutting Euclid

and North Union Road, respectively, as such areas may exist from time to time." *Id.* at ¶ 3. Exhibit D, depicted above, plainly provided for two access drives, a north one and a south one. LR has provided no basis for the Court to depart from the language of the agreement embodying the parties' intent to grant a reciprocal easement over the two access drives.

More problematic, however, is the identification of an appropriate remedy for breach, and any damages must necessarily be limited based on several factors at play in this case. The Court believes that equitable relief requiring LR to remove the building blocking the south access drive is unjustified. The record reflects that BR waited until construction was complete to seek any type of relief. Moreover, BR cannot identify the specific dimensions of the south access drive because neither party required that level of precision in the easement agreement. Therefore, it would be difficult, if not impossible, to fashion such injunctive relief to the extent of the breach. Finally, destroying the structure is necessarily economic waste. There are several business within the offending addition, and forcing them and the business they bring with them out serves little purpose at this point, post construction.

Any damage remedy must also consider additional factors. First, access to Euclid is still maintained for the benefit of BR. The only real loss is of one of the particular routes to Euclid. Moreover, in determining damages, the Court is also willing to consider an offer of proof for improvements to the existing north access drive that LR may be willing to submit, including potentially relocating the curb cut providing access to Euclid. Second, BR still maintains the unexercised contractual entitlement to install a sign near the north access drive; the only way the general public would know that they were not otherwise trespassing on LR's property to reach BR's property. Third, as noted, the site plan does not provide any dimensions or criteria for any of the

access drives. Fourth, BR would not be entitled to use either access drive to benefit its adjacent property that is not the subject of the easement agreement. Fifth, the access drive is proximate to the intersection of a Euclid Avenue and North Union Road, providing little logistical advantage as an alternative route.

B.

Under Michigan Law, a trespass is simply "an unauthorized invasion upon the private property of another." *Cloverleaf Car Co. v. Phillips Petroleum Co.*, 213 Mich. App. 186, 195, 540 N.W.2d 297 (1995). A *prima facie* case of trespass includes proof by the plaintiff of (1) possession of a property interest; (2) invasion of that interest; (3) intent to commit the act that causes the invasion; and (4) the defendant's act proximately caused the invasion. *Rogers v. Kent Bd. of County Rd. Comm'rs*, 319 Mich. 661, 30 N.W.2d 358 (1948).

> The Restatement of Torts describes the elements of a private nuisance as follows:
>
> One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either
>
> > (a) intentional and unreasonable, or
>
> > (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

Rest 2d Torts § 822.

Although the record reflects some evidence that the easements were blocked and that, at times, vehicles may have parked on BR's parcels, there is little proof as to the specific dates, duration of any blockage of the easement, and whether LR played a role in the alleged misconduct. Any recover for trespass therefore will be subject to additional proofs that can identify concrete

damages as a result of LR's actions.

Similarly, the only claim of nuisance that BR advances in its moving papers is framed as follows:

> Further, Defendants actions constitute a nuisance because Defendants' dumpsters have created an unsanitary condition on Plaintiff's Property and have created an unsightly condition that impacts Plaintiff's business and restaurant operations. Not to mention that the garbage disposal trucks contracted by Defendants have blocked traffic on the BR Associates Parcel and impeded traffic thereby creating a safety hazard.

Pl.'s Mot. Partial Summ. J. at 19. Again, despite the existence of some proof of nuisance, BR has not demonstrated concretely how it has was harmed and what damages it incurred as a result of LR's alleged recalcitrance. In order to recover, BR will have to submit proof at trial.

C.

As noted, BR claims that LR violated the easement agreement by moving, without BR's consent, the north access drive. LR disputes this claim, arguing first that BR cannot even show the dimensions of the north access drive and therefore cannot recover, and second that it simply moved driving isles, not the access drive, as it is permitted to do under the agreement. The Court is mindful of the parties contentions, but will defer ruling on that aspect of the motions for summary judgment until LR has had an opportunity to identify improvements it may make to the north access drive in order to compensate BR for the loss of the south access drive.

III.

The record evidence in this case establishes that BR is entitled to judgment as a matter of law on its claim that the LR violated the easement agreement by constructing an addition to its plaza over the south access drive. However, the remedy will necessarily be limited by certain factors at play in this case, and damages will be determined after LR is afforded an opportunity to propose

improvements to the north access drive that may compensate BR for its loss. BR's claims for trespass and nuisance will be subject to additional proofs that identify specific damages resulting from LR's actions. The Court will defer ruling on the parties' motions for summary judgment with respect to the north access drive until LR has identified improvements it may make to that drive.

Accordingly, it is **ORDERED** that the plaintiff's motion for partial summary judgment [dkt # 31] is **GRANTED IN PART**.

It is further **ORDERED** that the defendants' motion for summary judgment [dkt # 30] is **DENIED WITH PREJUDICE** with respect to the south access drive, and **DENIED WITHOUT PREJUDICE** with respect to the plaintiff's remaining claims.

It is further **ORDERED** that the Court will entertain a written offer of proof, to be submitted on or before **August 22, 2007**, on any improvements it may be willing to make to the north access drive.

It is further **ORDERED** that BR may submit a supplemental brief not to exceed **fifteen pages** addressing the deficiency in the proofs identified above with respect to change of location of the north access drive and damages as a result of alleged trespass and nuisance on or before **August 22, 2007**.

It is further **ORDERED** that the final pretrial conference in this matter is **RESCHEDULED** for **August 29, 2007 at 2:00 p.m.** The Court will address the supplemental materials at the conference.

It is further **ORDERED** that trial shall commence on **September 11, 2007 at 8:30 a.m.**

                                        s/Thomas L. Ludington
                                        THOMAS L. LUDINGTON
                                        United States District Judge

Dated: June 26, 2007

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 26, 2007.

                                                s/Tracy A. Jacobs
                                                TRACY A. JACOBS